UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

THOMAS YOUNG and                                              No. 20-11844-t11
CONNIE YOUNG,

     Debtors.

## **OPINION**

Debtors filed this subchapter V bankruptcy case pro se on September 23, 2020. On February 25, 2021, the Court held a final hearing on confirmation of Debtors' plan and on Enterprise Bank & Trust's ("EBT's") motion to convert the case to chapter 7. The Court concludes that the plan is not confirmable and that grounds exist to convert the case. At the request of EBT and the subchapter V trustee, however, the Court will remove Debtors from possession as an alternative to conversion.

1.     Facts.[1]

Debtors live in Santa Fe, New Mexico. Mr. Young, in his late 80s, is retired. Mrs. Young, in her late 70s, is a real estate broker, working mostly in the Santa Fe area. Post-petition, Mrs. Young has earned at least $50,000 in commissions.

This is Debtors' fifth chapter 11 case in ten years. The first four cases delayed creditors but did not result in a discharge, a confirmed plan, or any payments to creditors.[2]

---

[1] The Court takes judicial notice of its docket in this case and Debtors' prior bankruptcy cases to consider the contents of the docket but not the truth of the matters asserted therein. *Johnson v. Spencer*, 950 F.3d 680, 705 (10th Cir. 2020).

[2] Debtors filed chapter 11 cases in 2011, 2013, 2017, and 2019. The 2011 case was converted to chapter 7 and then dismissed; the 2013 case was dismissed on the U.S. Trustee's motion; the 2017 case was dismissed by stipulation; the 2019 case was dismissed by default. The 2019 dismissal order barred Debtors from refiling for 180 days. The 180-day bar expired March 1, 2020.

Debtors' bankruptcy estate includes the following real estate:

| Property | Value (per Debtors) | Lien | Equity |
|---|---|---|---|
| 1413 Paseo de Peralta, Santa Fe, NM (vacant lot) | $75,000 | $86,000 (First American judgment lien) | $0 |
| 1574 Wilderness Gate, Santa Fe, NM (Debtors' house) | $1,500,000 | $1,899,000 (Deutsche) | $0 |
| 307 Pino Drive, Santa Fe, NM (rental property) | $700,000 | $521,000 (MTGLQ) | $179,000 |
| 354 Calle Loma Norte, Unit 54B, Santa Fe, NM (condominium) | $365,000 | $568,000 ($290,000 first lien of Wilmington; $278,000 junior lien of EBT) | $0 |

In about March 2020, Debtors negotiated a reduced payoff with MTGLQ. Under the deal, MTGLQ would be deemed paid in full if it received $510,000 before March 15, 2021. Debtors made no effort to take advantage of the discounted payoff by listing the rental property for sale.

Mrs. Young apparently has back trouble and wants to get a platelet rich plasma ("PRP") treatments offered by a doctor in California. The treatments are not covered by insurance, and Mrs. Young was unable to guess how much they cost. Debtors' initial schedule B, filed pro se, does not disclose that funds were set aside for the PRP treatments. Debtors' first amended schedule B discloses $30,000 in "cash and cash-equivalents" was set aside for the treatments. Debtors' second amended schedule B, however, reduced that amount to $800. Finally, under cross-examination Mrs. Young admitted that she set aside at least $10,500 for PRP treatments three weeks prepetition. Further, in closing argument Debtors' counsel referred to the $30,000 amount. The Court finds that Mrs. Young accumulated at least $30,000 pre- and postpetition for PRP treatments (the "Set-Aside Money"), meaning that she set aside at least $19,500 postpetition. The Set-Aside Money was not disclosed in Debtors' monthly operating reports, nor mentioned in the Plan.

EBT holds a junior lien on the condominium, securing a debt of $278,000.[3] EBT's predecessor brought a foreclosure action against the condominium in 2015. The parties signed a settlement agreement in 2019 that gave Debtors a substantial payment discount if they made certain monthly payments. Debtors defaulted under the agreement.

On November 30, 2020, EBT filed a motion to convert the case to chapter 7, pursuant to § 1112(b).[4] In response to the motion, the subchapter V trustee asked, as an alternative to conversion, that Debtors be removed from possession, per § 1185(a).

Debtors filed their plan of reorganization on December 22, 2020 (the "Plan"). The Plan proposes to retain a liquidating trustee to sell the vacant lot and the rental property. After deducting all trustee fees, broker's fees, attorney's fees, and costs of sale, the estimated net proceeds from selling the rental property are about $125,000. The Plan proposes that keep $100,000 of this amount and distribute the rest to creditors.[5] Debtors estimate that there is no equity in the vacant lot.

For Debtors' house and the condominium, the Plan proposes to terminate the automatic stay so the secured creditors can continue their foreclosure actions.[6]

The Plan does not include any payments from Debtors because, according to the Plan, Mrs. Young will retire, leaving Debtors with no disposable income.

---

[3] EBT's mortgage is junior to the first mortgage held by Wilmington Savings Fund Society FSB, as trustee for a trust that owns mortgage-backed securities. Wilmington's lien is about $290,000. At best, EBT has an unsecured claim of about $200,000. At worst, EBT is essentially unsecured.

[4] All statutory references are to 11 U.S.C. unless otherwise indicated.

[5] Given an estimated $40,000 for administrative expense claims, nothing would be left for unsecured creditors.

[6] At least with respect to the house, Debtors would be allowed to assert defenses to foreclosure. It is not clear if Debtors might still assert defenses in the condominium foreclosure action. The stipulated stay relief order, discussed below, implies that Debtors are "walking away" from the condominium, but that is not as clear as it could be. Given Debtors' *modus operandi*, the Court would not be surprised if Debtors tried to continue the foreclosure battle.

The Plan treats EBT's secured claim as follows:

EBT will retain its lien in [sic] [the condominium]. The discharge injunction shall not apply to EBT, to the extent it would impede EBT's continued prosecution of the…Foreclosure Action for in rem relief related to [the condominium]. EBT shall have no unsecured claim against the Debtors.

The Plan drew objections from the U.S. Trustee, the IRS, the subchapter V trustee, and five creditors, including EBT. EBT and Class 8 (general unsecured claims) voted against the plan.

In opening argument at the final hearing on Plan confirmation, Debtors' counsel represented that Debtors had resolved many of the objections by agreeing to Plan modifications. These modifications included deleting the $100,000 payment to Debtors from the rental property sales proceeds and deleting the provision in the treatment of EBT's secured claim that they would have no deficiency claim. In addition, Debtors agreed to give Wilmington stay relief so it could foreclose on the condominium. The Court never received a written copy of the Plan modifications.

Despite the modifications, EBT and the subchapter V trustee continued to oppose the plan at the final hearing.

2.      The Plan is Not Confirmable.

"The essential elements for Chapter 11 Subchapter V plan confirmation are set forth at 11 U.S.C. § 1191, which incorporates with modifications 11 U.S.C. § 1129(a)-(b)." *In re Fall Line Tree Service, Inc.*, 2020 WL 7082416, at *2 (Bankr. E.D. Cal.). The Plan satisfies a number of the confirmation requirement of § 1191 but falls short in several key areas.

a.    Best Interests of Creditors Test. As EBT and Class 8 are impaired[7] and voted against the plan,[8] the plan can be confirmed only if they would receive at least as much under the plan as in a hypothetical chapter 7 liquidation. § 1129(a)(7)(A)(ii). Debtors did not carry their burden of proving that the Plan passes this "best interests of creditors" test. *See In re Juarez*, 836 Fed. App'x 557, 560 (9th Cir. 2020) (outlining the test); *In re W.R. Grace & Co.*, 475 B.R. 34, 142 (D. Del. 2012) ("the plan proponent bears the burden of proof to establish by a preponderance of the evidence that its plan is within the creditors' best interests"). The Plan is funded solely by the sale of the rental property (the vacant lot has no equity). Debtors propose to hire a liquidating trustee to sell the property, who in turn would hire a broker. Based on Debtors' estimates, the rental property might generate about $125,000 for creditors, after paying MTGLQ, property taxes, broker's fees, and the liquidating trustee's fees. Though Debtors no longer propose to keep

---

[7] A claim is impaired if the plan alters its "legal, equitable, [or] contractual rights", or if the plain fails to cure, reinstate, and compensate for a default. Section 1124. "Courts have consistently interpreted the term 'impairment' very broadly," encompassing even alterations that enhance the value of a creditor's rights. *In re Smith*, 123 B.R. 863, 866 (Bankr. C.D. Cal. 1991). The plan as written clearly impairs EBT's claim; it abolishes EBT's deficiency claim. The amended treatment proposed at the confirmation hearing is little better, as it is clear that unsecured claims would receive little or nothing . If Debtors wanted to ensure that EBT's was unimpaired, they could have paid the loan as agreed. The proposed treatment falls far short of that, and constitutes clear impairment. *See, e.g., In re Elijah*, 41 B.R. 348, 350 (Bankr. W.D. Mo. 1984) ("A plan which neither pays the debt as required by the debt instrument nor surrenders all the collateral does alter rights. The wording is clear. Alteration is synonymous with impairment."). "In addition, a delay in payment of a claim beyond its contractual maturity date results in impairment." 7 Collier on Bankruptcy ¶ 1124.03; *In re Otero Mills, Inc.*, 31 B.R. 185 (Bankr. D.N.M. 1983) ("This section requires that there be no default on the contract either before or after the filing of the petition, and requires the debtor to continue making payments pursuant to the contract.").

[8] There are five unsecured claims, including EBT's deficiency claim. Only two of the five creditors voted in favor of the plan, not enough to carry the class. § 1126(c). In opening and closing arguments at the final hearing, Debtors represented that a third creditor had amended his ballot and was now voting in favor of the plan. No testimony or other evidence was introduced to prove the change of vote. To date, no amended ballot has been filed. The Court finds that Class 8 rejected the plan.

$100,000 for themselves, they have not shown it more likely than not that creditors would receive under the Plan at least what they could get in a hypothetical chapter 7 liquidation.

Debtors argue that their Plan is better than liquidation because the trustee fees in chapter 7 would be higher than the proposed liquidating trustee fees. That may not be right. The trustee fee schedule in § 326(a) sets a ceiling, not a floor. Similar to Debtor's proposal for paying the liquidating trustee, the Court likely would allow chapter 7 trustee fees on the net proceeds realized from selling the rental property (after paying off the mortgage), not the gross sales price. If the net proceeds were $125,000, the fee would be capped at $9,500. Debtors propose to pay their liquidating trustee at least $13,250. In addition, in a chapter 7 liquidation the Set-Aside Money would be available to creditors.

The Court concludes that creditors would do better in a chapter 7 liquidation than under the Plan.

      b.    <u>Fair and Equitable</u>. Because EBT and the Class 8 general unsecured creditors voted against the Plan, it can only be confirmed if it is "fair and equitable" to them. Section 1191(b). It is not.

          i.    <u>EBT's Secured Claim</u>. Cramdown of secured claims is the same in subchapter V as in other chapter 11 cases. Section 1191(c)(1). To cram down, a plan must provide that the creditor retains its lien and receives payments equal to the value of its collateral; or that the collateral be sold and the creditor's lien attach to the proceeds; or that the creditor receive the "indubitable equivalent" of its secured claim. Section 1129(b)(2)(A). The plan does not provide any of these alternatives for EBT's secured claim. Instead, it allows EBT to continue its foreclosure action against the condominium. While surrendering collateral to the creditors satisfies indubitable equivalence, 7 Collier ¶ 1129.04[2][c][i], mere stay relief does not. Furthermore, as noted above,

it is not clear that Debtors have waived any of their defenses. The treatment of EBT's secured claim is not tantamount to surrender.

        ii.    <u>Class 8 Unsecured Claims</u>. The Plan is not "fair and equitable" to Class 8 either. A subchapter V cramdown plan must provide for "all of the projected disposable income of the debtor" over the life of the plan be paid into the plan or else that "the value of the property to be distributed under the plan" should not be less than the projected disposable income amount. Section 1191(c)(2).[9] The Plan ignores this requirement altogether. Debtors justify the omission by arguing that they will not have any disposable income.

        There are three problems with the argument. First, Mrs. Young earned $50,000 between October 2020 and January 2021 (the four months for which MORs were filed), which equates to an annual gross income of $150,000. That should be more than enough to generate disposable income.[10] Based on Mrs. Youngs' testimony, it seems almost certain that she will continue to work. Debtors' projected disposable income over the life of the plan would not be $0. This is evidenced in part by the fact that Mrs. Young "saved" $19,500 in four months for the PRP treatments.

        Second, If a subchapter V debtor cannot (or chooses not to) make plan payments, creditors lose the quid pro quo for eliminating the absolute priority rule. *See, e.g.*, William L. Norton III and

---

[9] Section 1191(c)(2)(B) is similar to § 1225(b)(1)(C). The latter subsection was added in 2005 by BAPCPA, to "permit the court to confirm a plan even if the distribution [sic] proposed under the plan equal or exceed the debtor's projected disposable income for that period, providing the plan otherwise satisfies the requirements for confirmation." House Report No. 109-31, Pt. 1, p. 137. The goal was to allow debtors flexibility in paying creditors given the cyclical nature of farming, including making payments that might exceed projected disposable income during lean times. Under that rationale, § 1191(c)(2)(B) allows subchapter V debtors to pay more than, but not less than, their projected disposable income in a particular period and to control the timing of payments.

[10] Debtors used the "means test" of § 707(b)(2) to calculate their projected disposable income. Unlike in chapter 13, *see* §§ 1325(b) and (c), subchapter V "disposable income" is not based on the means test. § 1191(d). *See also In re Roedemeier*, 374 B.R. 264, 271–73 (Bankr. D. Kan. 2007) (means test not applicable measurement of disposable income in chapter 11 bankruptcy).

James B. Bailey, *The Pros and Cons of the Small Business Reorganization Act of 2019*, 36 Emory Bankr. Dev. J. 383, 390 (2020) ("Although the debtor does not have to satisfy the absolute priority rule, new § 1191 does require the debtor to devote projected disposable income or its value to pay creditors."); Paul W. Bonapfel, *A Guide to the Small Business Reorganization Act of 2019*, 93 Am. Bankr. L.J. 571, 607–09 (Winter 2019) (to the same effect). Debtors who elect not to make plan payments should not get the benefit of subchapter V. If making reasonable plan payments while working is unpalatable to the Debtors, they should have filed a chapter 7 case.

Third, if Mrs. Young really does retire, then Debtors would no longer be "engaged in commercial or business activities," as required by § 1182(1)(A). Debtors have every right to retire. They cannot and should not be forced to continue working to pay their creditors. However, if retirement is their choice, the benefits of subchapter V should not be available to them. Again, if Debtors were sincere about resolving their debts but did not want to make plan payments, they should have filed a chapter 7.

c.      <u>Good Faith</u>. Finally, the Plan was not proposed in good faith. "Good faith, under 11 U.S.C. § 1129(a)(3), means that the plan, under the facts and circumstances, 'will fairly achieve a result consistent with the Bankruptcy Code.'" *In re UVAS Farming Corp.*, 91 B.R. 579, 582 (Bankr. D.N.M. 1988) (citing *In re Madison Hotel Assoc.*, 749 F.2d 410, 425 (7th Cir. 1984)). As is evident from the Plan and Debtors' actions, Debtors filed this subchapter V case to combine the benefits of chapter 7 (e.g., discharge; no postpetition payments) with the delay inherent in the chapter 11 process. The Plan is consistent with Debtors' misuse of chapter 11 for the last ten years.

Debtors' lackadaisical attitude toward their reporting obligations generally, and their handling of the Set-Aside Money specifically, is in bad faith. None of their MORs were filed timely. Debtors never filed a report covering September 23-30, 2020, nor have they filed a report

for their February 2021 operations. With the four filed MORs, the Court cannot account for approximately $7,000 that Debtors list as "Checks Paid/Cleared." The checks do not show up in Debtors' attached bank records and may be indicative of undisclosed bank accounts. Further, several check copies that are attached to the MORs (amounting to thousands of dollars) are made out to the Debtors themselves or to "Cash." The application of these funds was never adequately explained by the Debtors. The Set-Aside Money was never properly disclosed, is not exempt, and should be paid to creditors. Debtors apparently thought it more important to keep the money than to comply with the Bankruptcy Code.

Further, Debtors' significant, last-minute changes to their Plan do not show good faith. Debtors should not have filed an unconfirmable plan with the intent of making substantial changes at the confirmation hearing. Rather, the Plan (which could only be filed by Debtors) should have been their best effort at proposing confirmable terms.

Debtors' decade-long pattern of misusing the bankruptcy process, up to and including this case and the Plan, strongly indicates bad faith. The proofs of claim show that Debtors haven't paid their home mortgage since 2010; did not pay their condominium mortgage or fees between 2011 and 2018; owe an accountant for work done in 2012; and owe a lawyer for work done in 2013. The Plan, which proposed to pay $40,000 to their lawyer and the trustee, pay themselves $100,000, keep $30,000 of pre- and post-petition earnings, and make no plan payments, is of a piece with Debtors' decade of bankruptcy malfeasance.

3.     EBT's Motion to Convert.

EBT moved to convert this case to chapter 7 pursuant to § 1112(b), which provides that, for "cause," a bankruptcy court may convert or dismiss a chapter 11 case, whichever is in the best

interests of creditors.[11] Cause is not defined but 16 examples are given in § 1112(b)(4). The Court finds that there is cause to convert the case.

        a.    <u>Bad Faith</u>. Pre-petition bad faith can be grounds for dismissal or conversion under § 1112(b). *See, e.g., In re Melendrez Concrete, Inc.*, 2009 WL 2997920, at *4 (Bankr. D.N.M.) ("Prepetition conduct of a debtor can be considered to determine whether cause exists under § 1112(b)(4) to convert or dismiss on the ground the chapter 11 case was filed in bad faith."); *In re Nursery Land Dev., Inc.*, 91 F.3d 1414, 1415 (10th Cir. 1996) (affirming the bankruptcy court's finding of bad faith filing based on debtor's prepetition conduct). The Court calculated all the time Debtors have lingered in bankruptcy, under the protection of the automatic stay. 118 months have elapsed since Debtors first petitioned the Court on May 31, 2011. Debtors have been in one of their five cases for 67.5 of those months, or 57.2% of the time. The Court finds that Debtors filed this case in bad faith, "solely to frustrate the legitimate efforts of a legitimate creditor to enforce his rights. . . ." *Nursery Land Dev.*, 91 F.3d at 1415.

        b.    <u>Continuing Loss; No Likelihood of Rehabilitation</u>. Had Debtors been serious about paying creditors, last September they would have surrendered the house, condominium, and vacant lot and hired a broker to sell the rental house. Instead, they did nothing and paid nothing for five months, while their debts continued to mount. The estate is worse off today than it was last September, and substantially worse off than it was in May 2011.

        Further, there is no reasonable likelihood of rehabilitation. Debtors have proven themselves unreliable debtors in possession. *See., e.g., In re Reliant Energy Channelview LP*, 594 F.3d 200, 210 (3d Cir. 2010) (debtors in possession have a duty to maximize the value of their estate for

---

[11] Section 1112(b) would also normally allow for the appointment of a trustee or examiner under § 1104, but § 1104 is inapplicable in subchapter V cases, per § 1181(a).

creditors). Their estate needs to be liquidated by someone who understands his fiduciary duty to creditors.

               c.     <u>Gross Mismanagement</u>. Debtors' delay in selling the rental property, their inadequate accounting, their handling of the Set-Aside Money, their failure to make postpetition payments to creditors, and their filing of a facially unconfirmable plan together constitute gross mismanagement.

4.    <u>Removing Debtors From Possession</u>.

        Responding to EBT's motion to convert, the subchapter V trustee asked for the alternative relief of removing Debtors from possession, per § 1185(a):

> On request of a party in interest, and after notice and a hearing, the court shall order that the debtor shall not be a debtor in possession for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, either before or after the date of commencement of the case, or for failure to perform the obligations of the debtor under a plan confirmed under this subchapter.

As with § 1112(b), the list of what constitutes cause under § 1185(a) is not exhaustive. 8 Collier ¶ 1185.01. The Court finds that cause exists to remove Debtors from possession.

               a.     <u>Gross Mismanagement</u>. As set forth above, Debtors have grossly mismanaged their estate.

               b.     <u>Bad Faith</u>. The Court concludes that bad faith should be considered under § 1185(a). The Court's bad faith findings are set out above.

               c.     <u>Dishonesty</u>. Debtors' handling of the Set-Aside Money has not been forthright and honest, nor has Debtor's post-petition accounting.

        Dismissal of the case has not been requested and does not appear to be "in the best interests of creditors and the estate." Section 1112(b)(1). Conversion to chapter 7 is a plausible option for creditors. The main advantages of keeping the case in chapter 11 and removing Debtors from

possession are that the current trustee is quite familiar with the case and that if he is able to liquidate the estate and distribute money to creditors, his fee may be lower than a chapter 7 trustee's fee. During closing argument, EBT's counsel supported granting this alternative relief.

Only a debtor may file a plan under subchapter V. Section 1189(a). Because of that, the subchapter V trustee may need to seek conversion at some point. That is for another time. By separate order, the Court will remove Debtors as debtors in possession according to § 1185.

Conclusion.

Debtors' Plan cannot be confirmed. There are grounds to convert this case or remove Debtors from possession. All things considered, the Court concludes that creditors would be better served by keeping the case in chapter 11 and removing Debtors from possession. A separate order will be entered.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: March 26, 2021
Copies to: Counsel of record